## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FILMORE JOHNSON and            :
FELICIA JOHNSON, H/W           : CIVIL ACTION
                               :
        Plaintiffs             :
                               :
     vs.                       : NO. 14-CV-4630
                               :
OYR REALTY PARTNERS LP,        :
ET. AL.,                       :
                               :
        Defendants             :

### MEMORANDUM AND ORDER

**JOYNER, J.**                                    **November 30, 2015**

This civil action has been brought before the Court on Motion for Summary Judgment of Defendants OYR Realty Partners, L.P., OYR Realty Partners II, L.P., OYR Realty Partners, III, L.P., OYR Realty Partners, IV, L.P., OYR Realty GP, LLC and OYR Realty Partners GP, LLC, Logan Plaza Condominium Association, Inc., and Stonehenge Advisors, Inc. (the "OYR Defendants").  For the reasons which follow, the motion shall be granted in part and denied in part.

### History of the Case

This case arose on Saturday, July 14, 2012 at approximately 6:30 p.m. in the rear parking lot of the Robinson Building in the Logan Plaza complex located at 5201 Old York Road in the Logan section of Philadelphia.  At that date and time, Plaintiff Fillmore Johnson exited the rear door of the building which

housed his employer, Vision Quest, when he was attacked and robbed by two masked men while he was placing a bag into the trunk of his car.  In the course of the robbery and attack, Mr. Johnson sustained physical injuries to his head, right shoulder, face and arm as well as emotional trauma and was robbed of more than $250 and his GPS.  Although he reported the crime to the Philadelphia Police Department, the perpetrators were never found.

Mr. Johnson and his wife Felicia instituted this suit on July 10, 2014 in the Philadelphia County Court of Common Pleas against Defendants, as the purported owners and possessors of the property and/or the entity responsible for providing the security thereto.  Because the Johnsons had moved to Kentucky in the intervening two years since the attack and the citizenship of the parties was then diverse, Defendant Securitas filed a Notice of Removal to this Court on August 6, 2014.  An Amended Complaint was subsequently filed on March 20, 2015 to add OYR Realty Partners GP, LLC, Logan Plaza Condominium Association and Stonehenge Advisors, Inc. as defendants.[1]  In both the original and the amended complaints, Plaintiffs sought relief from all of the defendants for their injuries and loss of consortium under the theory of negligence.  Discovery has since closed and by the

---

[1]   In addition, the parties stipulated to the voluntary dismissal without prejudice of several other OYR entities: OYR Realty Group, OYR Realty GP II LLC, OYR Realty GP III LLC and OYR Realty GP IV LLC on November 3, 2014.

motion now before us, Defendants seek the entry of summary judgment in their favor on the grounds that, *inter alia*, there is insufficient evidence to establish a *prima facie* case of negligence against them and/or one or the other of them were not owners or possessors of the parking area where Mr. Johnson was injured and therefore owed no duty to the plaintiffs.

## Standards Governing Summary Judgment Motions

The principles guiding the determination of motions for summary judgment are stated as follows in Fed. R. Civ. P. 56(a):

> A party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense - on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Where the defendant is the moving party, the burden is on the defendant to show that the plaintiff has failed to establish one or more essential elements of her case. Burton v. Teleflex, Inc., 707 F.3d 417, 425 (3d Cir. 2013)(citing Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)). In all cases, the initial burden is on the party seeking summary judgment to point to the evidence which it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); United States v. Donovan, 661 F. 3d 174, 185 (3d Cir. 2011).

The court reviewing a motion for summary judgment should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Scheidemantle v. Slippery Rock University, State System of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006)). The line between reasonable inferences and impermissible speculation is often "thin," but is nevertheless critical because "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." Halsey v. Pfeiffer, 750 F. 3d 273, 287 (3d Cir. 2014)(quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382, n.12 (3d Cir. 1990) and Fragale & Sons Beverage Co. v. Dill, 760 F.2d 469, 474 (3d Cir. 1985)).

Inferences must flow directly from admissible evidence. Id. Further, an issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). In any event, to survive summary judgment, the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the non-movant. Burton, supra,(quoting

4

Jakimas v. Hoffman-LaRoche, Inc., 485 F.3d 770, 777 (3d Cir. 2007)).

## **Discussion**

As noted, Plaintiffs' cause of action is premised upon the theory that Defendants were negligent in providing proper security for the parking lot area where the husband-plaintiff was attacked and injured.  "As a court sitting in diversity, we 'must apply the substantive law of the state whose laws govern the action.'" Midgette v. Wal-Mart Stores, Inc., 317 F. Supp. 2d 550, 556-557 (E.D. Pa. 2004), aff'd 121 Fed. Appx. 980 (3d Cir. 2005)(quoting Erie Railroad v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938) and Robertson v. Allied Signal, Inc., 914 F.2d 360, 378 (3d Cir. 1990)).  In this case therefore, we apply the law of Pennsylvania.

In Pennsylvania, "[n]egligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." Schemberg v. Smicherko, 2014 PA Super 23, at *9-*10, 85 A.3d 1071, 1075 (Pa. Super. 2014)(quoting Merlini ex rel Merlini v. Gallitzin Water Authority, 602 Pa. 346, 980 A.2d 502, 506 (Pa. 2009).  "The primary element in any negligence cause of action is that the defendant owes a duty of care to the plaintiff." Id,(quoting Althaus ex rel. Althaus v. Cohen, 562 Pa. 547, 756 A.2d 1166, 1168 (Pa. 2000)).  Hence,

under Pennsylvania common law, the elements of a negligence claim
include: a legally recognized duty, a breach of that duty, a
causal relationship between the defendant's negligence and the
plaintiff's injuries, and damages.  <u>City of Philadelphia v.
Beretta U.S.A. Corp.</u>, 277 F.3d 415, 422 (3d Cir. 2002)(citing
<u>Martin v. Evans</u>, 551 Pa. 496, 711 A.2d 458, 461 (1998)); <u>Truax v.
Roulhac</u>, 2015 PA Super. 217, 2015 Pa. Super. LEXIS 584 at *10
(Oct. 7, 2015).

In general, Pennsylvania holds that there is no duty to
control the conduct of a third party to protect another from
harm.  <u>DeJesus v. U.S. Dept. Of Veterans Affairs</u>, 479 F.3d 271,
279-280 (3d Cir. 2007)(citing <u>Emerich v. Philadelphia Center for
Human Development, Inc.</u>, 554 Pa. 209, 720 A.2d 1032, 1036
(1998)).  However, a judicial exception to this general rule has
been recognized where a defendant stands in some special
relationship with either the person whose conduct needs to be
controlled or where the defendant is in a relationship with the
intended victim of the conduct, which gives to the intended
victim a right to protection.  <u>Emerich</u>, <u>supra</u>(citing *Restatement
(Second) of Torts* §315 (1965))[2].  Consequently, in the absence of

---

[2] §315 General Principle

There is no duty so to control the conduct of a third person as to
prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person
which imposes a duty upon the actor to control the third person's
conduct, or

a pre-existing duty, a party cannot be held liable for the criminal actions of a third party unless that party assumed a duty, through some act of its own.  <u>Midgette</u>, 317 F. Supp. 2d at 557-558.

In the seminal case of <u>Feld v. Merriam</u>, 506 Pa. 383, 485 A.2d 742, 746 (1984), the Pennsylvania Supreme Court was confronted with the "threshold question whether a landlord has any duty to protect tenants from the foreseeable criminal acts of third persons, and if so, under what circumstances."  506 Pa. at 390, 485 A.2d at 745.  Finding no reason to impose a general duty on landlords to protect tenants against criminal intrusion, the Supreme Court nevertheless looked to *Restatement (Second) of Torts,* §323[3] and held:

> However, a landlord may, as indicated, incur a duty voluntarily or by specific agreement if to attract or keep tenants he provides a program of security.  A program of security is not the usual and normal precautions that a reasonable home owner would employ to protect his property. It is, as in the case before us, an extra precaution, such as personnel specifically charged to patrol and protect the

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

[3] §323 Negligent Performance of Undertaking to Render Services

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

> > (a) his failure to exercise such care increases the risk of such harm, or

> > (b) the harm is suffered because of the other's reliance upon the undertaking.

premises.  Personnel charged with such protection may be expected to perform their duties with the usual reasonable care required under standard tort law for ordinary negligence.  When a landlord by agreement or voluntarily offers a program to protect the premises, he must perform the task in a reasonable manner and where a harm follows a reasonable expectation of that harm, he is liable. The duty is one of reasonable care under the circumstances.  It is not the duty of an insurer and a landlord is not liable unless his failure is the proximate cause of the harm.

A tenant may rely upon a program of protection only within the reasonable expectations of the program.  He cannot expect that a landlord will defeat all the designs of felonry.  He can expect, however, that the program will be reasonably pursued and not fail due to its negligent exercise.  If a landlord offers protection during certain periods of the day or night a tenant can only expect reasonable protection during the periods offered.  If, however, during the periods offered, the protection fails by a lack of reasonable care, and that lack is the proximate cause of the injury, the landlord can be held liable.  A tenant may not expect more than is offered.  If, for instance, one guard is offered, he cannot expect the same quality and type of protection that two guards would have provided, nor may he expect the benefits that a different program might have provided.  He can only expect the benefits reasonably expected of the program as offered and that that program will be conducted with reasonable care.

<u>Feld</u>, 506 Pa. at 393-394, 506 A.2d at 747.

   *A.  OYR Realty Partners II, LP, OYR Realty Partners III, LP, OYR Realty Partners IV, LP, OYR Realty GP LLC and OYR Realty Partners GP, LLC*

For their first legal argument in support of their motion for summary judgment, Defendants OYR Realty Partners II, LP, OYR Realty Partners III, LP, OYR Realty Partners IV, LP, OYR Realty GP LLC and OYR Realty Partners GP, LLC assert that they have no ownership interest in the premises where the incident occurred and thus owed no duty to the plaintiff.  (OYR Defendants'

8

Memorandum of Law in Support of Motion for Summary Judgment, 9-13).

In the case at hand, the record contains evidence that as of March 26, 2009, Defendant OYR Realty Partners, LP was "the owner in fee simple of the land and all of the improvements thereon ... commonly known as 5201 Old York Road in Philadelphia," and that on that date it executed an "Amended and Restated Declaration of Condominium" thereby establishing the Logan Plaza Condominium which consisted of five separate units. (OYR Defendants' Motion for Summary Judgment, Exhibit "G"). Pursuant to those condominium documents, Logan Plaza Condominium Association is the entity charged with the management of the 5201 Old York Road property, including the parking areas around 13th Street and Wagner Avenue. (Shaeffer Dep., 28-29).

It further appears that at present, Defendant OYR Realty GP, LLC owns all of the exterior and several of the buildings contained within Logan Plaza, including all of the parking lots, which are situate along 13th Street and Wagner Avenue. (Deposition of Richard Shaeffer, attached to Defendant Securitas' Motion for Summary Judgment as Exhibit "K," pp. 20, 24). The Robinson Building, which has Vision Quest, Husband-Plaintiff's former employer as its sole tenant, is now owned by OYR Realty Partners LP, II. (Shaeffer Dep., 21-23). Defendant OYR Realty Partners, III, LP owns the complex' Sley Building. (Shaeffer

Dep., 23-24).  Accordingly, while Defendants OYR Realty Partners III, LP, OYR Realty Partners IV, LP and OYR Realty Partners GP, LLC have no ownership interest in any part of the property which is relevant to this action, Defendants OYR Realty Partners II, LP and OYR Realty GP, LLC do.  The motion shall be granted as to OYR Realty Partners III, LP, OYR Realty Partners IV, LP and OYR Realty Partners GP, LLC but denied as to OYR Realty Partners II, LP and OYR Realty GP, LLC on the basis of ownership.

    *B.*  *OYR Realty Partners, LP*

    The OYR Defendants next assert that OYR Realty Partners, LP is entitled to judgment as a matter of law because it was not the possessor of the land at the time of Plaintiff's assault and therefore owed no duty to Plaintiffs, and because it is statutorily exempt from suit under the Pennsylvania Uniform Condominium Act.[4]  Regarding the first portion of its argument

---

[4]  Specifically, Moving Defendants point to 68 Pa. C.S.A. §3311(a)(2) as supporting their contention that OYR Realty Partners LP is not subject to the plaintiffs' tort claims.  That Statute reads as follows:

**§3311.  Tort and contract liability**

                    ...

**(2)** Except as otherwise provided by paragraph (1):

    (i) An action in tort alleging a wrong done by the association or by an agent or employee of the association, or an action arising from a contract made by or on behalf of the association, shall be brought against the association.

    (ii) A unit owner shall not be subject to suit or, except as otherwise provided by subsection (b), be otherwise directly or indirectly held accountable for the acts of the association or its agents or employees on behalf of the association.

concerning possession, Defendants rely upon Article 8, Section 8.2 of the Logan Plaza Declaration of Condominium which delegates the responsibility for the operation, maintenance, repair and replacement of the Common Elements[5] to the Association by stating

---

[5]   Article 5, Section 5.1 of the Declaration of Condominium defines "Common Elements" as consisting:

"of the entire Property except the Units and as more fully described below.  The portion of the Property outside of the Unit boundary lines, with all improvements constructed and to be constructed thereon, including all appurtenances thereto..."

Section 5.2 goes on to state that "[m]ore specifically, the Common Elements shall include, but not be limited to, the following:

a.  Land.  All of the land and premises within the Property, whether improved or unimproved.

b.  Improvements.  All of the improvements located upon the Property excluding and excepting therefrom the Units.

c.  Roadways.  All roadways on the Property, including driveways, curbing, Parking Areas and entranceways from the public right of way.

d.  Stormwater Management Facilities.  Any and all structures or facilities now or hereafter constructed or installed upon any portion of the Property (including, without limitation, any appurtenant easement) or features of the Property used for the purposes of managing, controlling, retaining or dispersing stormwater.

e.  Utility Facilities.  All Utility Facilities for services designed and intended for common use, such as but not limited to telephone, electricity, including any transformers, gas, water, sewer and located in common areas as well as all items affixed or connected thereto, or designed and intended for common use.

f.  Sprinkler System.  The Sprinkler System designed for and intended for common use.

g.  Personal Property.  All tangible personal property owned by the Association for use in connection with the operation, maintenance and administration of the Condominium.

h.  Facilities.  All other facilities or elements of any improvement within the Building or within the Condominium, necessary or convenient to the existence, management, operation, maintenance or safety of the Condominium or normally in common use.

i.  Other.  All of the walkways, paths, trees, shrubs, yards, gences, gardens, landscaping, common lighting, signage, and similar items which are not encompassed by the description of a Unit or Limited Common

as follows in pertinent part:

> 8.2 <u>Common Element Maintenance</u>.  Except as specifically provided for by Section 8.3 below, the Association shall be responsible for the operation, maintenance, repair and replacement of the Common Elements. ... The Association shall be responsible for the repair, restoration or replacement of all Common Element improvements damaged or destroyed as a result of a casualty and shall use any insurance proceeds resulting from such casualty to repair, restore or replace the Common Element improvements with materials at least equal to the quality of the materials being repaired, restored or replaced so as to maintain the architectural and aesthetic harmony of the Condominium as a whole.  The maintenance, repair, restoration and replacement of the Common Elements shall include, but not be limited to: the cleaning, maintenance, repair, restoration and replacement of (including, without limitation, in the case of sidewalks, paved Parking Areas, driveways, entranceways, the removal of snow and ice from) all sidewalks, paved Parking Areas, driveways, entranceways, the Property Signs, Additional Signs and all other Common Elements, except for any Limited Common Elements and shall include the lighting of all Common Elements and all landscaping located upon the Property. Lighting shall be provided during the hours as set forth by the Executive Board and otherwise in accordance with the Rules and Regulations to be adopted by the Association.  The Association shall provide a security guard at the main entrance to the Condominium twenty-four (24) hours per day, seven days per week, the cost of which shall be a General Common Expense. ...

In view of the clear and straight-forward nature of this language, we are constrained to agree that insofar as OYR Realty Partners, LP had transferred the responsibility for maintenance, repair, replacement and security to the Logan Plaza Condominium Association, it is properly dismissed as a defendant from this action.

While we need not reach the second prong of Defendants'

---

Elements.

argument that is, OYR Realty Partners, LP's statutory exemption, we would grant judgment in its favor on this basis as well. Again, we find the language of the Pennsylvania Uniform Condominium Act to be quite clear that where a declarant (which is what OYR Realty Partners, LP is here) has divided the property into units and designated the responsibility for maintenance and upkeep to a condominium association, "an action in tort alleging a wrong done by the association or by an agent or employee of the association, or an action arising from a contract made by or on behalf of the association," is to be brought against the condominium association and is not to be brought against a unit owner. 68 Pa. C. S. A. §3311(a)(2)(i),(ii). Inasmuch as the assault here occurred in the parking lot, a common element, and concerned security, the responsibility for which was delegated to the Logan Plaza Association, we conclude that OYR Realty Partners LP is entitled to judgment in its favor as a matter of law on this ground as well. (See also, Shaeffer Dep., 28-29).

   C.   *Logan Plaza Condominium Association, Inc. and*
        *Stonehenge Advisors*

   The OYR Defendants also claim that there is no evidence to establish a prima facie case of negligence as to Logan Plaza Condominium Association and Stonehenge Advisors, Inc., such that these defendants too are entitled to the entry of judgment in their favor. We disagree.

   Here, the record clearly reflects that Defendant Stonehenge

13

Advisors, Inc. has been charged with management of the Logan
Plaza properties since January 1, 2011 pursuant to a Management
Agreement with Defendant OYR Realty Partners LP dated December 7,
2010.  (Shaeffer Dep., 25; Exhibit "D" to OYR Defendants' Motion
for Summary Judgment).  Richard Shaeffer has been the Logan Plaza
Property Manager since he was hired by OYR Realty Partners LP in
June, 2005.  Subsequent to the decision of the OYR partnerships
to contract out the management of the Logan Plaza property and
the execution of the Management Agreement between OYR Realty
Partners LP and Stonehenge Advisors, Mr. Shaeffer became an
employee of Stonehenge Advisors but continued to hold the
position of Property Manager for Logan Plaza.  (Shaeffer Dep.,
10, 12-15).  In that capacity, Mr. Shaeffer supervises several
other Stonehenge employees - a director of maintenance, a
maintenance mechanic and two custodial workers.  (Shaeffer Dep.,
11).  In addition to taking care of the property overall and
overseeing the provision of security services, he is responsible
for managing the everyday needs of the tenants and addressing any
maintenance issues that may arise.  (Shaeffer Dep., 14, 27).

On or about January 21, 2011, Mr. Shaeffer as Managing Agent
for Stonehenge and on behalf of OYR Realty Group LLC-Logan Plaza
Condominium Association, executed a Security Services Agreement
with Defendant Securitas Security Services USA, Inc. (hereafter
"Securitas") for the provision of security services at Logan

14

Plaza commencing on January 24, 2011.  (OYR Defendants' Motion
for Summary Judgment, Exhibit "I"; Shaeffer Dep., 26-27).
According to Mr. Shaeffer, he was the primary contact with
Securitas in the discussion and negotiation of the terms of the
agreement and it was and is his obligation to ensure that the
security staff provided understands the nature of the facility
and their specific duties and responsibilities, to address any
concerns, issues or problems which they may have and to provide
the day-to-day direction and supervision. (Shaeffer Dep., 28-30).

        Under the security services agreement, Securitas was to
provide 1 security officer posted at the front desk (presumably
of every building in the complex), 24 hours a day, seven days a
week and 1 security officer posted at the Rear Lobby (again
presumably of every building) Monday through Friday between the
hours of 8:30 a.m. and 4:30 p.m.  The agreement further provides
that "Post duties to be confirmed through mutually acknowledged
Post Orders."  (Exhibit "I").   Insofar as the parking lot on
13th Street along Wagner Avenue is concerned, the assigned
security officer on duty during business hours is responsible for
enforcing parking rules and regulations, and making sure that the
parking spots assigned to particular tenants are being used only
by those tenants.  During non-business hours, after dark and
overnight the security guard on duty is to engage in exterior
walking patrols every two or so hours, at 7 p.m., 9 p.m., 11

p.m., 1 a.m., 3 a.m. and 5 a.m. (Shaeffer Dep., 31-33, 38).[6] On Saturdays, Sundays, holidays and during the day, the security officers didn't have any responsibility in the rear parking lot. (Shaeffer Dep., 33). Mr. Shaeffer decided to employ the security guards using this protocol because fewer people accessed the building during the evening and weekends and this reduced traffic flow freed up the one security officer on duty during those times to lock the front door and go out on patrol during the designated times. (Shaeffer Dep., 33-35). Similarly, it was thought to be a "prudent security measure" to lock the parking lot gates at 1 a.m. because there was only one security guard on duty and to re-open them at 5 a.m. because there were tenants that started operations very early in the morning. (Shaeffer Dep., 44-45).

Although two of Logan Plaza's tenants - the City of Philadelphia and Vision Quest were 24/7 operations, there was no monitoring of the doors utilized by Vision Quest personnel in the rear of the building at any time during the day or night or on weekends and holidays. (Shaeffer Dep., 44). There was no type of employee sign-in or sign-out procedure in place and Securitas personnel were not required to keep any sort of log book or daily

---

[6]   These directives are apparently the "post orders" referenced in the agreement and while given by Mr. Shaeffer, they were reduced to writing by someone else, presumably someone acting on behalf of Securitas. (Shaeffer Dep., 36-37). And, in addition under these unwritten orders, the security officer is to conduct interior patrols at 8 p.m., 10 p.m., 12 p.m., 2 a.m., and 4 a.m. (Shaeffer Dep., p. 38). Finally, Mr. Shaeffer further directed that all front and rear doors were to be locked at 7 p.m. and all gates at 1 a.m.; all doors were to open at 7:30 a.m. and all gates were to open at 5 a.m. (Shaeffer Dep., 40).

activity diary regarding their activities and observations at Logan Plaza, although they were under instructions to report any suspicious observations or occurrences to 911 and to Mr. Shaeffer.  If he was onsite at the time of the event, Mr. Shaeffer would go to see what was happening himself. (Shaeffer Dep., 46-50).  Securitas also employed the TOCO system at Logan Plaza whereby the security officers were required to carry a Toco pipe embedded with a chip and run it by the chip readers which were placed throughout the Plaza campus whenever they made their exterior patrols, in order to verify that regular patrols were made.  (Shaeffer Dep., 51-54).

Finally, while working security cameras relaying to a monitor at the building's front desk had been installed along the back of the buildings overseeing the rear parking area in 2007, the wiring for those cameras had been ripped out in the build-out of space for the Department of Public Welfare in 2009.  Although some consideration had been given to replacing those cameras, that never happened.  (Shaeffer Dep., 60-63).  Apparently, however, those cameras were still in place on the date of Mr. Johnson's assault, as Vision Quest had requested to look at the security cameras after it learned of what had happened to the plaintiff.  (Shaeffer Dep., 60-61).  As a result of Vision Quest's request to see the security cameras following Plaintiff's assault, Mr. Shaeffer sent an email to his contact at OYR Realty

Partners, Leonard Thylen advising him of the incident and suggesting that again having working exterior cameras should be considered due because the nature of the tenants and their hours of operation create security issues and because there had been a few instances where the use of cameras would have helped to decipher incidents that had occurred in the past with DPW clients.  (Shaeffer Dep., 61, 71-73).

All of the foregoing evidence, along with the Philadelphia Police All Incidents Report for 5201 Old York Avenue received in response to Plaintiff's Right to Know Law request, is more than adequate to make out a prima face case of negligence against the defendant Condominium Association and management company Stonehenge under <u>Feld</u>.  Clearly, these defendants owed to Defendants the duty to provide security in the parking lot behind the Vision Quest building and there is certainly sufficient evidence in the existing record to raise a genuine issue of material fact as to whether they knew or had reason to suspect that the security which was provided was inadequate.  Given that Mr. Johnson was injured as a result of the assault, we find that he has likewise made the requisite prima facie showing as to the elements of causation and damages to survive summary judgment. While moving defendants make much out of the plaintiff's failure to produce an expert report, in Pennsylvania "in negligence actions, expert testimony is not required where the matter under

18

investigation is so simple and the lack of skill or want of care so obvious, as to be within the range of ordinary experience and comprehension of even non professional persons." <u>Truax</u>, <u>supra</u>, at n.3(quoting <u>Ovitsky v. Capital City Econ. Dev. Corp.</u>, 2004 PA Super 41, 846 A.2d 124, 126 (Pa. Super. 2004)). "Here, a jury would be capable, even without expert testimony, to decide whether [Defendants] took reasonable care to protect their [tenants] by using common sense notions of safety in evaluating parking lot security measures." <u>Id</u>,(quoting <u>id</u>.). We therefore do not find the lack of an expert report to be dispositive on the matter of movants' negligence and the motion is therefore denied as to Defendants Logan Plaza and Stonehenge.

An order follows.