IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FILMORE JOHNSON and  :
FELICIA JOHNSON, H/W  : CIVIL ACTION
                      :
        Plaintiffs    :
                      :
     vs.              : NO. 14-CV-4630
                      :
OYR REALTY PARTNERS LP,  :
ET. AL.,              :
                      :
        Defendants    :

**MEMORANDUM AND ORDER**

**JOYNER, J.**                                    **December 7, 2015**

This civil action has been brought before the Court on Motion for Summary Judgment of Defendant Securitas Security Services, USA, Inc. ("Securitas"). For the reasons set forth in the paragraphs which follow, the motion is granted in part and denied in part.

**Factual Background**

This case has its origins in the assault and robbery of the husband-plaintiff, Fillmore Johnson on Saturday, July 14, 2012 at approximately 6:30 p.m. in the rear parking lot of the Robinson Building in the Logan Plaza complex located at 5201 Old York Road in the Logan section of Philadelphia. More particularly, Mr. Johnson had just left his workplace through the rear door and was placing a bag into the trunk of his car when he was attacked by two masked men who jumped out of a parked van. In the course of

the robbery and attack, Mr. Johnson sustained personal physical and emotional injuries and was robbed of more than $250 and his GPS.  Although he reported the crime to the Philadelphia Police Department, the perpetrators were never found.

Mr. Johnson and his wife Felicia commenced this action in the Philadelphia County Court of Common Pleas on July 10, 2014 against the OYR Defendants[1], as the purported owners and possessors of the property and Securitas as the entity responsible for providing the security thereto.  Because the Johnsons had moved to Kentucky in the intervening two years since the attack and the citizenship of the parties was then diverse, Defendant Securitas filed a Notice of Removal to this Court on August 6, 2014.  An Amended Complaint was subsequently filed on March 20, 2015 to add OYR Realty Partners GP, LLC, Logan Plaza Condominium Association and Stonehenge Advisors, Inc. as defendants.[2]  In both the original and the amended complaints, Plaintiffs sought relief from all of the defendants for their injuries and loss of consortium under the theory of negligence. Discovery has since closed and by the motion now before us,

---

[1] The "OYR Defendants" include OYR Realty Partners, LP, OYR Realty Partners, II LP, OYR Realty Partners, III LP, OYR Realty Partners IV LP, OYR Realty Partners GP LLC, Logan Plaza Condominium Association and Stonehenge Advisors, Inc.

[2] In addition, the parties stipulated to the voluntary dismissal without prejudice of several other OYR entities: OYR Realty Group, OYR Realty GP II LLC, OYR Realty GP III LLC and OYR Realty GP IV LLC on November 3, 2014.

Defendant Securitas seeks the entry of summary judgment in its favor on both the plaintiffs' direct claims and on the cross and counter claims of its co-defendants on the grounds that it provided all of the services required of it under its written contract with its client, OYR Realty GP, LLC (a/k/a "OYR Realty GP").

### **Standards for Ruling on Summary Judgment Motions**

As noted, the parties seek the entry of summary judgment under Fed. R. Civ. P. 56. Subsection (a) of that Rule provides,

> A party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense - on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Under this rule then, summary judgment is appropriate only if there are no genuine issues of material fact such that the movant is entitled to judgment as a matter of law. Erdman v. Nationwide Insurance Co., 582 F.3d 500, 502 (3d Cir. 2009). In considering a motion for summary judgment, the reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Burton v. Teleflex, Inc., 707 F.3d 417, 425 (3d Cir. 2013). The initial burden is on the party seeking summary judgment to point to the evidence "which it believes demonstrate the absence of a genuine issue of material fact." United States v. Donovan, 661 F.2d 174,

185 (3d Cir. 2011)(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986)). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986)). If the non-moving party bears the burden of persuasion at trial, "the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden." Id, (quoting Wetzel v. Tucker, 139 F.3d 380, 383 n.2 (3d Cir. 1998)). "The mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue." Renchenski v. Williams, 622 F.3d 315, 324 (3d Cir. 2010)(quoting Giles v. Kearney, 571 F.3d 318, 322 (3d Cir. 2009). Thus, "if there is a chance that a reasonable juror would not accept a moving party's necessary propositions of fact," summary judgment is inappropriate. Id.(quoting El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007)).

## Discussion

As noted, Plaintiffs' cause of action is premised upon the

4

theory that each and all of the Defendants were negligent in providing proper security for the parking lot area where the husband-plaintiff was attacked and injured. "As a court sitting in diversity, we 'must apply the substantive law of the state whose laws govern the action.'" Midgette v. Wal-Mart Stores, Inc., 317 F. Supp. 2d 550, 556-557 (E.D. Pa. 2004), *aff'd* 121 Fed. Appx. 980 (3d Cir. 2005)(quoting Erie Railroad v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938) and Robertson v. Allied Signal, Inc., 914 F.2d 360, 378 (3d Cir. 1990)). Consequently, in this case, the law of Pennsylvania applies.

In Pennsylvania, "[n]egligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." Schemberg v. Smicherko, 2014 PA Super 23, at *9-*10, 85 A.3d 1071, 1075 (Pa. Super. 2014)(quoting Merlini ex rel Merlini v. Gallitzin Water Authority, 602 Pa. 346, 980 A.2d 502, 506 (Pa. 2009)). "The primary element in any negligence cause of action is that the defendant owes a duty of care to the plaintiff." Id,(quoting Althaus ex rel. Althaus v. Cohen, 562 Pa. 547, 756 A.2d 1166, 1168 (Pa. 2000)). Hence, under Pennsylvania common law, the elements of a negligence claim include: a legally recognized duty, a breach of that duty, a causal relationship between the defendant's negligence and the plaintiff's injuries, and damages. City of Philadelphia v. Beretta U.S.A. Corp., 277 F.3d 415, 422 (3d Cir. 2002)(citing

5

Martin v. Evans, 551 Pa. 496, 711 A.2d 458, 461 (1998)); Truax v. Roulhac, 2015 PA Super. 217, 2015 Pa. Super. LEXIS 584 at *10 (Oct. 7, 2015).

Further, under Pennsylvania caselaw, a plaintiff may bring a cause of action sounding in tort based upon a defendant's negligent performance of contractual obligations owed to another party. Farabaugh v. Pennsylvania Turnpike Commission, 590 Pa. 46, 69, 911 A. 2d 1264, 1277 (2006). In this regard, Pennsylvania follows the Restatement (Second) of Torts, §324A, which states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Cantwell v. Allegheny County, 506 Pa. 35, 483 A. 2d 1350 (1984).

In order to state a cause of action under §324A, a complaint must contain factual allegations sufficient to establish the legal requirement that the defendant has undertaken "to render services to another which he should recognize as necessary for the protection of a third person." Id, at 1353-1354. If a

6

defendant has no reason to foresee that his undertaking is necessary for the protection of the third person plaintiff, section 324A does not apply. Glick v. Olde Town Lancaster, Inc., 369 Pa. Super 419, 427, 535 A.2d 621, 625 (1987)(citing Cantwell, 506 Pa. at 41, 483 A.2d. at 1354). Thus, the primary question in a §324A analysis is foreseeability. See, Cantwell, supra.

*A. Summary Judgment as to Plaintiffs' Claims*

In this case, the record clearly establishes that on January 21, 2011, OYR Realty Group, LLC[3]-Logan Plaza Condominium Association (by and through its Managing Agent, Defendant Stonehenge Advisors, Inc.) entered into a Security Services Agreement with Defendant Securitas for the provision of security services at Logan Plaza, 5201 Old York Road in Philadelphia. (Defendant Securitas' Motion for Summary Judgment ["MSJ"], Exhibit "G"). Stonehenge has been charged with management of the Logan Plaza properties since January 1, 2011 pursuant to a Management Agreement with Defendant OYR Realty Partners LP dated December 7, 2010. (Shaeffer Dep., 25; Exhibit "D" to OYR Defendants' Motion for Summary Judgment).

Richard Shaeffer has been the Logan Plaza Property Manager

---

[3] From all appearances, Securitas erroneously designated OYR Realty Group, LLC as one of the clients on the agreement with Logan Plaza instead of OYR Realty GP LLC. This was evidently a mistake or a typographical error as OYR Realty Group, LLC does not exist. (Shaeffer Dep., 25-27). OYR Realty GP LLC does exist and is the owner of some of the buildings and all of the exterior of the Logan Plaza complex at 5201 Old York Road in Philadelphia. (Shaeffer Dep., 20).

7

since he was hired by OYR Realty Partners LP in June, 2005. Subsequent to the decision of the OYR partnerships to contract out the management of the Logan Plaza property and the execution of the Management Agreement between OYR Realty Partners LP and Stonehenge Advisors, Mr. Shaeffer became an employee of Stonehenge Advisors but continued to hold the position of Property Manager for Logan Plaza. (Shaeffer Dep., 10, 12-15). In that capacity, Mr. Shaeffer supervises several other Stonehenge employees - a director of maintenance, a maintenance mechanic and two custodial workers. (Shaeffer Dep., 11). In addition to taking care of the property overall and overseeing the provision of security services, he is responsible for managing the everyday needs of the tenants and addressing any maintenance issues that may arise. (Shaeffer Dep., 14, 27).

On or about January 21, 2011, Mr. Shaeffer as Managing Agent for Stonehenge and on behalf of OYR Realty Group LLC-Logan Plaza Condominium Association, executed a Security Services Agreement with Defendant Securitas Security Services USA, Inc. (hereafter "Securitas") for the provision of security services at Logan Plaza commencing on January 24, 2011. (OYR Defendants' Motion for Summary Judgment, Exhibit "I"; Shaeffer Dep., 26-27). According to Mr. Shaeffer, he was the primary contact with Securitas in the discussion and negotiation of the terms of the agreement and it was and is his obligation to ensure that the

8

security staff provided understands the nature of the facility and their specific duties and responsibilities, to address any concerns, issues or problems which they may have and to provide the day-to-day direction and supervision. (Shaeffer Dep., 28-30).

Under the security services agreement, Securitas was to provide 1 security officer posted at the front desk, 24 hours a day, seven days a week and 1 security officer posted at the Rear Lobby every Monday through Friday between the hours of 8:30 a.m. and 4:30 p.m. The agreement further provided: "Post duties to be confirmed through mutually acknowledged Post Orders." (Exhibit "I"). Regarding the parking lot on 13th Street along Wagner Avenue, the assigned security officer on duty during business hours is responsible for enforcing parking rules and regulations, and making sure that the parking spots assigned to particular tenants are being used only by those tenants. During non-business hours, after dark and overnight, the security guard on duty is to engage in exterior walking patrols every two or so hours, at 7 p.m., 9 p.m., 11 p.m., 1 a.m., 3 a.m. and 5 a.m. (Shaeffer Dep., 31-33, 38).[4] On Saturdays, Sundays, holidays and during the day, the security officers didn't have any

---

[4] These directives are examples of the "post orders" referenced in the agreement and while given verbally by Mr. Shaeffer, they were reduced to writing by someone else, presumably someone acting on behalf of Securitas. (Shaeffer Dep., 36-37). Not all post orders were reduced to writing at all as was the case with the unwritten orders that the security officer is to conduct interior patrols at 8 p.m., 10 p.m., 12 p.m., 2 a.m., and 4 a.m. and the direction that all front and rear doors were to be locked at 7 p.m., all gates to be locked at 1 a.m., all doors were to open at 7:30 a.m. and all gates were to open at 5 a.m. (Shaeffer Dep., 38, 40).

9

responsibility in the rear parking lot. (Shaeffer Dep., 33). Mr. Shaeffer decided to employ the security guards using this protocol because fewer people accessed the building during the evening and weekends and this reduced traffic flow freed up the one security officer on duty during those times to lock the front door and go out on patrol during the designated times. (Shaeffer Dep., 33-35). Similarly, it was thought to be a "prudent security measure" to lock the parking lot gates at 1 a.m. because there was only one security guard on duty and to re-open them at 5 a.m. because there were tenants that started operations very early in the morning. (Shaeffer Dep., 44-45).

Although two of Logan Plaza's tenants - the City of Philadelphia and Plaintiff's employer, Vision Quest, were 24/7 operations, there was no monitoring of the doors utilized by Vision Quest personnel in the rear of the building at any time during the day or night or on weekends and holidays. (Shaeffer Dep., 44). There was no type of employee sign-in or sign-out procedure in place and Securitas personnel were not required to keep any sort of log book or daily activity diary regarding their activities and observations at Logan Plaza, although they were under instructions to report any suspicious observations or occurrences to 911 and to Mr. Shaeffer. If he was onsite at the time of the event, Mr. Shaeffer would go to see what was happening himself. (Shaeffer Dep., 46-50). Securitas also

employed the TOCO system at Logan Plaza whereby the security officers were required to carry a Toco pipe embedded with a chip and run it by the chip readers which were placed throughout the Plaza campus whenever they made their exterior patrols, in order to verify that regular patrols were made. (Shaeffer Dep., 51-54).

Finally, while working security cameras relaying to a monitor at the building's front desk had been installed along the back of the buildings overseeing the rear parking area in 2007, the wiring for those cameras had been ripped out in the build-out of space for the Department of Public Welfare in 2009. Although some consideration had been given to replacing those cameras, that never happened. (Shaeffer Dep., 60-63). Apparently, however, those cameras were still in place on the date of Mr. Johnson's assault, as Vision Quest had requested to look at the security cameras after it learned of what had happened to the plaintiff. (Shaeffer Dep., 60-61). As a result of Vision Quest's request to see the security cameras following Plaintiff's assault, Mr. Shaeffer sent an email to his contact at OYR Realty Partners, Leonard Thylen advising him of the incident and suggesting that again having working exterior cameras should be considered because the nature of the tenants and their hours of operation create security issues and because there had been a few instances where the use of cameras would have helped to decipher

incidents that had occurred in the past with DPW clients. Thus the record demonstrates that the decision to de-activate the security cameras was made several years prior to the effective date of the security agreement at issue and that it was made by one or more of the OYR entities and not Securitas. (Shaeffer Dep., 61, 71-73).

Again here, the husband-plaintiff was assaulted at approximately 6:30 p.m. on a Saturday evening in July, 2012. At that time, the only security officer on duty was stationed at the front desk of the Vision Quest building which was in accordance with the terms and provisions of the Security Services Agreement it had entered into with OYR Realty Group, LLC - Logan Plaza Condominium Association and as it had been instructed by Mr. Shaeffer. There is no evidence in the record that Securitas personnel did not make their scheduled patrols on the day of this incident, which patrols in any event were not required to begin until after dark, several hours after the assault occurred. Hence, while the record in this matter thus evinces that Securitas did indeed undertake to render security services to the tenants of the OYR entities, Stonehenge and the Logan Plaza association and/or their invitees for consideration, it is now clear that the determination of what services were necessary to protect these third persons or their things was made by Mr. Shaeffer, his direct employer and the owners and operators of the

property. There is no evidence that Securitas failed to provide any of the services which it was contractually obligated to provide and no evidence that it failed to exercise reasonable care in so doing. We therefore find that Securitas did not breach any of the duties which it owed to Plaintiffs and that it is entitled to the entry of judgment in its favor as a matter of law on all of the Plaintiffs' claims against it.

    B.    *Summary Judgment as to Securitas' Claims Against OYR Realty GP*

Securitas next moves for the entry of judgment in its favor on its cross-claims for, *inter alia*, contractual contribution, sole liability, liability over and indemnification against OYR Realty GP. In so moving, Securitas relies upon Paragraph 5 of the Security Services Agreement which provides as follows in relevant part:

> LIABILITY LIMITATION AND INDEMNITIES:
>
> (a) Client agrees that Company is not an Insurer and that the amounts payable hereunder are based upon the value of services provided and not the value of Client's Interests being protected or the property of Client or of others located on Client's premises. Accordingly, Company makes no representation, express or implied, that its services will prevent any loss or damage.
>
> (b) Company agrees to and will indemnify, defend and hold Client harmless from and against any claim arising from Company's performance of the services under this Agreement, but only to the extent the Claim is caused by the negligence of Company, its employees or agents while acting within the scope of their duties and authority. Client agrees to and will indemnify, defend and hold Company harmless from and against any Claim in connection with this Agreement, but only to the extent the Claim is caused by the negligence of

Client, its employees or agents.

(c) Notwithstanding the foregoing Section 5(b), Client agrees that in no event will Company's or its insurer's total claimed liability for any claim arising out of the services provided hereunder exceed the maximum amount of $2,500.00. Further, if the services include alarm response, in no event will Company's or its insurer's total claimed liability for any claim arising from any delay or failure in responding to an alarm exceed the maximum amount of $500.00. The limitations of liability in this Section 5© will apply regardless of whether the Claim is alleged to arise, directly or indirectly, in whole or in part, from the negligence (active or passive) or misconduct or a breach of this Agreement by Company, its employees or agents, including that related to the hiring, training, supervision or retention of Company's employees or agents.

(d) Notwithstanding the foregoing Section 5(b), Client will indemnify, defend and hold Company harmless from and against any Claim in connection with this Agreement to the extent the Claim exceeds $2,500.00. Further if the services include alarm response, Client will indemnify, defend and hold Company harmless from and against any Claim in connection with any delay or failure in responding to an alarm to the extent the Claim exceeds $500.00. The Client's defense and indemnity obligations in this Section 5(d) will apply regardless of whether the Claim is alleged to arise, directly or indirectly, in whole or in part, from the negligence (active or passive) or misconduct or a breach of this Agreement by Company, its employees or agents, including that related to the hiring, training, supervision or retention of Company's employees or agents.

....

It has long been the law in the Commonwealth of Pennsylvania that "if parties intend to include within the scope of their indemnity agreement a provision that covers losses due to the indemnitee's own negligence, they must do so in clear and unequivocal language. No inference from words of general import can establish such indemnification." Greer v. City of

Philadelphia, 568 Pa. 244, 248, 795 A.2d 376, 378 (2002)(quoting Ruzzi v. Butler Petroleum Co., 527 Pa. 1, 588 A.2d 1 (1991) and Perry v. Payne, 217 Pa. 252, 66 A. 553 (1907)). This principle, which has come to be known as the Perry-Ruzzi rule, arose because the Pennsylvania Supreme Court determined that "assuming liability for the negligence of an indemnified party 'is so hazardous, and the character of the indemnity so unusual and extraordinary, that there can be no presumption that the indemnitor intended to assume the responsibility unless the contract puts it beyond doubt by express stipulation.'" Id,(quoting Ruzzi, 588 A.2d at 4 and Perry, 66 A. at 557).

However, in those cases where a potential indemnitee (such as Securitas here) is adjudicated a non-negligent party, the Perry-Ruzzi rule is not relevant. See, Mace v. Atlantic Refining & Marketing Corp., 567 Pa. 71, 785 A.2d 491, 495 (2001). Rather, in such instances, the courts must look to general principles of contract interpretation to determine whether an obligation exists to defend and/or indemnify another party. Id, 785 A.2d at 496. And, as the Pennsylvania Supreme Court observed in Mace,

> A fundamental rule in construing a contract is to ascertain and give effect to the intent of the contracting parties. ... It is firmly settled that the intent of the parties to a written contract is contained in the writing itself. When the words of a contract are clear and unambiguous, the meaning of the contract is ascertained from the contents alone.

Id, (citing Shovel Transfer & Storage, Inc. v. Pennsylvania

Liquor Control Bd., 559 Pa. 56, 65, 739 A.2d 133, 137 (1999), J.K. Willison, Jr. v. Consolidation Coal Co.,536 Pa. 49, 54, 637 A.2d 979, 982 (1994) and Steuart v. McChesney, 498 Pa. 45, 49, 444 A.2d 659, 661 (1982)). A document is deemed to be ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. Municipal Authority of Midland v. Ohioville Borough Municipal Authority, 108 A.3d 132, 138 (Pa. Cmwlth. 2015)(citing Sun Co. (R&M) v. Pennsylvania Turnpike Commission, 708 A.2d 875, 878 (Pa. Cmwlth. 1998)). In that event, parol evidence is admissible to explain, clarify or resolve the ambiguity and any ambiguous language is construed against the drafter and in favor of the other party if the latter's interpretation is reasonable. Id,(citing Id).

In application of these principles, while our reading of the pertinent provisions of paragraph 5 reveals no real ambiguities and is suggestive of an obligation on the part of OYR to defend and indemnify Securtitas, we frankly are unable to discern which of the OYR defendants are or should be responsible for such an obligation under the terms and conditions portion of the security services agreement. Given that Securitas is the drafter of this agreement, we shall decline to enter judgment in its favor at this time on the cross-claims.

For all of the foregoing reasons, the instant motion is granted in part. An order follows.